**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JAMIE A. INKS, | CASE NO. 5:22-CV-01742 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Jamie A. Inks ("Plaintiff" or "Mr. Inks") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and is before

the undersigned pursuant to the consent of the parties.  (ECF Doc. 9.)  For the reasons set forth

below, the Court **AFFIRMS** the Commissioner's decision.

## I.      Procedural History

Mr. Inks protectively filed his SSI and DIB applications on June 12, 2020, alleging

disability beginning October 17, 2017.  (Tr. 16, 246-53, 254-57.)  He later amended his alleged

onset date to June 2, 2020.  (Tr. 16, 338.)  He alleged disability due to fibromyalgia, monocular

diplopia, and generalized anxiety.  (Tr. 95, 106, 119, 131, 266.)  His application was denied at

the initial level (Tr. 143-52) and upon reconsideration (Tr. 160-69).  He then requested a hearing.

(Tr. 176-77.)

1

On July 21, 2021, a telephonic hearing was held before an Administrative Law Judge ("ALJ"). (Tr. 33-56.) The ALJ issued an unfavorable decision on August 20, 2021, finding Mr. Inks had not been under a disability from June 2, 2020, through the date of the decision.[1] (Tr. 13-32.) Plaintiff requested review of the decision by the Appeals Council. (Tr. 243-45.) The Appeals Council denied his request for review on August 1, 2022, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-7.) Mr. Inks then filed this pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 11, 14, 16).

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Mr. Inks was born in 1973. (Tr. 26.) He was 47 years old on the alleged disability onset date. (*Id*.) He has four or more years of college. (Tr. 266-67.) He is married. (Tr. 38.) He has past relevant work as a small business owner and router operator. (Tr. 39-41, 49-50.) He last worked in 2019, when he owned and operated a chocolate store. (Tr. 39.)

### B. Medical Evidence

Although the ALJ identified numerous severe physical and mental impairments (Tr. 19), Mr. Inks bases his appeal on his mental impairments and visual dysfunction (ECF Doc. 11). The evidence summarized herein therefore focuses on Mr. Inks's mental and visual impairments.

#### 1. Mental Health Impairment Treatment History

Mr. Inks presented to Mona Park, MS, LPCC-S, of The Counseling Center of Wayne and Holmes Counties ("Counseling Center") on December 2, 2020, for a telehealth visit.[2] (Tr. 884.)

---

[1] Mr. Inks had two prior applications for benefits denied by administrative law judges. (Tr. 16, 57-70, 71-92.) Those decisions have not been challenged in the present appeal. (ECF Doc. 11, p. 2, n. 1; ECF Doc. 14, p. 5, n. 1.)

[2] Mr. Inks's treatment records reflect a reported history of depression and anxiety pre-dating the alleged onset date of June 2, 2020. (Tr. 356, 884, 886, 1117.) He has reported treatment for mental health conditions dating back to at least 1999 and multiple suicide attempts between 1999 and 2002. (*Id*.)

He reported prior diagnoses of bipolar disorder and anxiety, and sought counseling and psychiatric services.  (*Id*.)  On mental status examination, Mr. Inks's appearance, speech, thought process, though content, perceptions, and cognitive and intellectual functioning were unremarkable.  (Tr. 885-86.)  He had poor eye contact and was non-verbal, agitated, unable to sit, and paced.  (Tr. 885.)  He was sad, anxious, nervous, and worried.  (Tr. 885-86.)  LPCC Park referred Mr. Inks to psychiatry for medication review.  (Tr. 889.)

Mr. Inks returned to LPPC Park on December 16, 2020 (Tr. 893-94) and January 5, 2021 (Tr. 896-97) for telehealth counseling sessions.  During his December 16 session, he reported social anxiety and frustration over not being able to help with chores at home due to pain and vision problems.  (Tr. 894.)  He reported in January that he was depressed over the holidays, but was able to improve his mood.  (Tr. 897.)  He said his stepsons had returned home for the holidays and he tried to keep things positive for them.  (*Id*.)  No significant changes to Mr. Inks's mental status were reported or observed.  (Tr. 894, 897.)

Mr. Inks presented to Mark DalPra, CNP, at the Counseling Center on January 19, 2021, for a telehealth medication management visit.  (Tr. 899.)  He reported having anxiety and panic since the 1990's.  (Tr. 901.)  He associated his anxiety with being with people.  (*Id*.)  He said he "just fear[ed] having to interact with others."  (*Id*.)  He reported anxiety and panic symptoms that included upset stomach, dry mouth, shaking, anger, irritability, lower extremity weakness, and rumination.  (*Id*.)  He said: "my family hides from me."  (*Id*.)  He also reported symptoms of depression, including anhedonia, low motivation, low energy, and increased need for sleep.  (*Id*.) On mental status examination, his rapport with CNP DalPra was appropriate and he was oriented with coherent speech, euthymic mood, and fair judgment, insight, and memory.  (Tr. 902-03.) His thought content/process was appropriate, but he expressed feelings of worthlessness,

3

hopelessness, and guilt.  (Tr. 903.)  He also reported fleeting thoughts of self-harm without plan

or intent.  (*Id*.)  He was diagnosed with: major depressive disorder, recurrent episode, mild; panic

disorder; generalized anxiety disorder; alcohol use disorder, mild, in sustained remission; and

rule-out bipolar disorder.  (Tr. 899-900.)  CNP DalPra prescribed Pristiq 25 mg. (Tr. 904.)

Mr. Inks returned to LPCC Park for a telehealth counseling session on January 20, 2021,

and continued to see her for counseling sessions every few weeks through May 26, 2021.[3] (Tr.

998-1000, 1007-09, 1017-22, 1030-34, 1042-43.)  Mr. Inks also continued to see CNP DalPra for

telehealth medication management appointments monthly from February 26, 2021, through May

13, 2021.  (Tr. 1001-06, 1010-16, 1023-29, 1035-41.)

When Mr. Inks saw CNP DalPra on February 16, 2021, he reported that he started his

new medication and "felt good."  (Tr. 1003.)  On examination, his rapport with CNP DalPra was

appropriate and he was oriented with coherent speech and fair judgment, insight, and memory.

(Tr. 1005.)  His mood was euthymic, but also anxious and depressed.  (*Id*.)  His thought

content/process was appropriate, but he expressed feelings of worthlessness, hopelessness, and

guilt.  (*Id*.)  He had fleeting thoughts of self-harm without plan or intent.  (*Id*.)  CNP DalPra

increased his Pristiq to 50 mg.  (Tr. 1006.)

When Mr. Inks saw CNP DalPra on March 16, 2021, for medication management, he

reported he was doing "ok," his "mood [had] 'leveled off pretty well,'" he was less depressed

with less anxiety, and he had been able to "keep his stress levels down."  (Tr. 1012.)  His mental

status examination findings were unchanged from his prior appointment.  (*Compare* Tr. 1014-15

*with* Tr. 1005.)  When he met with LPCC Park the following day, Mr. Inks reported that he drove

---

[3] With the exception of the May 26, 2021 session (Tr. 1042-43), all counseling sessions were telehealth sessions.
(Tr. 998-1000, 1007-09, 1017-22, 1030-34.)

the day before, but became anxious when he had to get gas.  (Tr. 1018.)  LPCC Park observed Mr. Inks was mildly depressed and anxious.  (*Id*.)

Mr. Inks presented to his primary care provider Jordan L. Garrison, D.O., at the Cleveland Clinic on April 16, 2021, for follow up regarding multiple conditions.  (Tr. 974.)  He reported he was working with the Counseling Center, and that Pristiq had recently been added to his Lexapro.  (*Id*.)  He said he was "[s]till struggling with motivation and feeling overwhelmed and down at times due to feeling like . . . a failure" and unable to "contribute to [his] family." (*Id*.)  He denied suicidal or homicidal concerns.  (*Id*.)  His diagnoses included generalized anxiety disorder and situational depression.  (Tr. 978.)  He was advised to continue his medication and to continue to follow up with his psychiatrist.  (*Id*.)

During a telehealth medication management appointment with CNP DalPra on April 13, 2021, Mr. Inks reported that he had been a little more depressed and anxious.  (Tr. 1025.)  His mental status examination findings were unchanged from his prior appointment.  (*Compare* Tr. 1027-28 *with* Tr. 1014-15.)  His medication was continued.  (Tr. 1028.)

During a May 13, 2021 telehealth medication management appointment with CNP DalPra, Mr. Inks reported that he had changed his routine and was doing well.  (Tr. 1037.)  His father-in-law had passed away recently, causing increased stress and responsibilities (Tr. 1040), but he was providing support to his wife, had not had outbursts, and had been able to maintain emotional control.  (Tr. 1037.)  It was noted that he was wearing an eye patch to help with his double vision.  (*Id*.)  On examination, his rapport with CNP DalPra was appropriate, he was oriented with coherent speech, and his judgment, insight, and memory were fair.  (Tr. 1039-40.) His mood was euthymic, his thought content/process was appropriate, and he had no thoughts, plan, or intent to harm himself or others.  (Tr. 1040.)  His medication was continued.  (Tr. 1041.)

5

When Mr. Inks saw LPCC Park on May 26, 2021, he reported that he had gone to the grocery store on his own.  (Tr. 1043.)  LPCC Park noted that Mr. Inks's anxiety and depression were mild, his appearance, hygiene, and participation level were good, he was not agitated, and he had no problem with judgment.  (Tr. 1042.)

Mr. Inks presented to Nishi Rajguru, APRN, CNP, at the Cleveland Clinic on July 2, 2021, for a psychiatric assessment conducted via distance health.  (Tr. 1116.)  He was referred by Dr. Garrison, with his chief complaint being "a lot of stress related to [his] physical health." (*Id*.)  Mr. Inks's wife was present.  (*Id*.)  He reported he was unemployed and was in the process of applying for disability.  (*Id*.)  He noted he had an upcoming hearing scheduled.  (*Id*.)  He said that he was easily irritable and overwhelmed.  (*Id*.)  He reported using medical marijuana during manic states to help with his symptoms.  (*Id*.)  He said he struggled with staying asleep and racing thoughts.  (*Id*.)  He reported feelings of guilt.  (Tr. 1117.)  He said that his energy levels fluctuated due to pain, his appetite was decreased, and it was difficult for him to focus.  (*Id*.)  He reported having to use a dry erase board even when cooking dinner, and said cooking dinner took him three hours.  (*Id*.)  He was afraid of social encounters and going under bridges.  (*Id*.)  He said that he was anxious about leaving the house once pandemic restrictions were lifted.  (*Id*.) He said his memory was poor and that he had severe anxiety and panic symptoms.  (*Id*.)  He reported some obsessive and compulsive tendencies.  (*Id*.)  Depression screening based on Mr. Inks's Patient Health Questionnaire (PHQ-9) was indicative of severe depression.  (Tr. 1120.)

The mental status examination conducted by CNP Rajguru on July 2, 2021, revealed that Mr. Inks was anxious, but he behaved appropriately, his speech was appropriate, his "social relatedness" was euthymic, he had a full and appropriate affect, his associations were intact and linear, his insight and judgment were appropriate.  (Tr. 1121.)  There were no reported

hallucinations at the time, but he reported paranoid, grandiose, or nihilistic delusions at times. (*Id.*)  he reported thoughts of death, but not suicide.  (*Id.*)  Mr. Inks was diagnosed with bipolar II disorder and generalized anxiety disorder, and conversion disorder was noted as a provisional diagnosis.  (Tr. 1121-22.)  CNP Rajguru continued Mr. Inks on Pristiq and Lexapro and added Seroquel to help with anxiety, racing thoughts, and difficulties with sleep.  (Tr. 1122.)  Mr. Inks expressed interested in transferring his psychiatric care to the Cleveland Clinic.  (*Id.*)

### 2.    Vision Impairment Treatment History

Mr. Inks presented to optometrist Jennifer Smith O.D. at the Looking Glass on July 19, 2016, complaining of double and blurred vision.  (Tr. 1049.)  He returned to Dr. Smith on July 26, 2016, to pick up glasses and to complete visual field testing. (Tr. 1054.)  He reported he was still seeing horizontal double vision with the glasses.  (*Id.*)  Dr. Smith communicated with Dr. Garrison regarding recommended additional testing to rule out certain conditions.  (Tr. 1058.) When Mr. Inks returned to Dr. Smith on October 10, 2017, he continued to report double and blurred vision which he rated as moderate.  (Tr. 1059.)  He said his symptoms were always present, but sometimes worse than other times.  (*Id.*)  Dr. Smith diagnosed alternating exotropia and diplopia.  (Tr. 1068.)  Mr. Inks returned to Dr. Smith on December 11, 2017, reporting that he continued to see double vision and his eyes strained when looking through glasses.  (Tr. 1069.)  He reported seeing neurologists in the past but said he had not returned for recommended neurological testing.  (*Id.*)  Dr. Smith continued to diagnose alternating exotropia and diplopia. (Tr. 1073.)  She urged Mr. Inks to follow up with neurology for the additional testing.  (*Id.*)

Mr. Inks presented to neurologist Richard Lederman, M.D., Ph.D., at the Cleveland Clinic on February 6, 2018, for an evaluation regarding multiple symptoms that potentially had a neurological origin, including muscle pain and stiffness and double vision.  (Tr. 355-57.)  He

reported that his double vision had been present for at least a couple of years.  (Tr. 356.)  Dr.

Lederman observed the following during the eye examination:

> Visual acuity was 20/30 in the right eye and 20/25 in the left eye. He had double
> vision with either eye independently.  It was predominantly horizontal today. The
> images apparently get further apart with increasing distance.  Eye movements are
> intact and normal.  Pupils are 2 mm and react normally.  Facial sensation and motor
> function are symmetrical and normal. Hearing, speech, and lower cranial nerves are
> normal.

(*Id.*)  Dr. Lederman found no evidence of a neurological disorder, commenting: "Monocular

diplopia in the absence of an ocular cause is generally attributable to non-organic disorders."

(*Id.*)  He also noted that Mr. Inks appeared "to have diffuse or multifocal muscular pain and

stiffness."  (Tr. 356-57.)  During a primary care appointment with Dr. Garrison on September 13,

2019, Mr. Inks complained of quadruple vision and was diagnosed again with diplopia.  (Tr. 388,

391.)  Dr. Garrison noted that further evaluation by a neurologist or surgeon for a muscle biopsy

might be recommended in the future. (Tr. 391.)

Mr. Inks presented to Craig See, M.D., at the Cleveland Clinic for his vision complaints.

(Tr. 359-61, 371.)  Mr. Inks reported fatigue and an inability to judge distances or perform work

on a computer.  (Tr. 371.)  He presented disability paperwork.  (*Id.*)  Corneal topography atlas

imaging was normal.  (Tr. 359-61, Tr. 371.)  Mr. Inks was diagnosed with dry eye syndrome of

the bilateral lacrimal glands and diplopia.  (Tr. 371.)   Dr. See recommended RGP over-

refraction to see if it would eliminate Mr. Inks's diplopia and stated: "I will not fill out any

disability paperwork until he has tried RGP over-refraction." (*Id.*)  Dr. See recommended that

occupational therapy for his difficulties using computer, fatigue, and depth perception.  (*Id.*)

Mr. Inks presented to Michelle Kunkle OTR/L, CHT, at Wooster Community Hospital on

July 6, 2020, for an occupational therapy evaluation for his diagnoses of muscle weakness /

binocular diplopia.  (Tr. 1104-05.)  He reported "difficulty with vision safety with ambulation,

8

headaches with computer or reading tasks." (Tr. 1104.)  His rehabilitation plan included addressing "difficulty with vision limiting [his] ability to read, drive and scan his environment." (Tr. 1105.)  She recommended therapy twice a week for four weeks. (*Id*.)  Ms. Kunkle discharged Mr. Inks from occupational therapy in August 2020 after nine visits.  (Tr. 1101.)

Mr. Inks presented to optometrist Rebecca Lauffenburger O.D., at Family Eye Care of Wooster, LLC on August 6, 2020, for his complaint of double vision.  (Tr. 909-10.)  Mr. Inks was pleasant and sociable during his appointment.  (Tr. 910.)  He reported that his double vision was constant; he saw two images with both eyes, and closing one eye did not help.  (Tr. 909.) Dr. Lauffenburger observed a central corneal deformity of moderate irregularity on topography. (Tr. 910.)  She recommended monitoring for "trend analysis."  (*Id*.)  Dr. Lauffenburger ordered a trial pair of rigid gas-permeable contact lens to try to improve Mr. Inks's diplopia.  (*Id*.)  Mr. Inks returned to Dr. Lauffenburger for contact lens fitting on September 1, 2020.  (Tr. 908-09.) The contact lenses did not reduce Mr. Inks's diplopia and Dr. Lauffenburger recommended that Mr. Inks continue with neurology to rule out other muscle coordination / fatigue syndromes. (Tr. 908.)  She indicated that a letter with findings would be provided for disability paperwork.  (*Id*.)

Mr. Inks presented to neurologist Yonatan Spolter, M.D., at Akron General on October 23, 2020, for his complaints of muscle weakness and diplopia.  (Tr. 859.)  He reported seeing "[four] of all objects" and felt it caused him difficulty balancing and walking.  (*Id*.)  Dr. Spolter felt that "[g]iven his history of monocular diplopia without ophthalmologic cause, as well as diffuse neurologic symptoms despite negative work-up in the past, conversion disorder should be considered."  (Tr. 866.)  Dr. Spolter discussed with Mr. Inks "the typical features of conversion disorder and the evidence supporting cognitive behavioral therapy as a treatment modality."

(*Id.*)  Mr. Inks reported he was not currently undergoing psychotherapy due to the pandemic and said he was not interested in reexamining psychotherapy at the time.  (*Id.*)

During a follow up appointment with his primary care physician Dr. Garrison on April 16, 2021, Mr. Inks reported he had been seen by several eye specialists with no obvious explanation for his double vision.  (Tr. 974.)  He reported trying occupational therapy.  (*Id.*)  Mr. Inks was wearing an eye patch on one eye.  (Tr. 977.)  He reported to Dr. Garrison that he had been wearing an eye patch by choice, rotating it between eyes every day or every half day.[4]  (Tr. 974.)  When discussing his pain complaints with Dr. Garrison at the visit, Mr. Inks reported that he had gone on a short bike ride with his wife but was unable to do anything physical for two days after the bike ride because of all over body pain.  (*Id.*)

Mr. Inks presented to ophthalmologist Joshua Evans, M.D., at the OSU Wexner Medical Center Havener Eye Institute Westerville on June 1, 2021 (Tr. 1081-90) for a baseline examination with complaints of binocular and monocular vision changes that were not resolved with prism (Tr. 1084).  He reported that with one eye closed he saw two images side-by-side and with both eyes open he saw four images.  (Tr. 1083.)  He said he had a lot of pain, headaches, and muscle fatigue, and wore an eye patch that he alternated between each eye.  (*Id.*)  A DFE exam was normal and an external examination of the eyes was "significant only for mild lower lid retraction OU."  (*Id.*)  Mr. Inks was diagnosed with vision changes and Dr. Evans recommended that Mr. Inks continue to wear glasses and follow up in six weeks.  (Tr. 1083.)

---

[4] During his appointments with CNP DalPra in April and May 2021, it was observed that Mr. Inks was wearing an eye patch on one eye.  (Tr. 1025, 1037.)  Mr. Inks said he wore the eye patch to "cut out double vision."  (*Id.*)

10

3.      **Opinion Evidence**

i.      **Treating Source Opinions**

**<u>Jennifer Smith, O.D.</u>**

Dr. Smith completed a Medical Source Statement: Visual Impairment questionnaire on May 5, 2020.  (Tr. 1044.)  Dr. Smith checked boxes indicating that Mr. Inks could not read very small print or avoid ordinary hazards in the workplace such as boxes on the floor, doors ajar, or approaching people or vehicles, but he could read an ordinary newspaper or book print, view a computer screen, and determine differences in shape and color of small objects such as screws, nuts or bolts.  (*Id*.)  When asked to identify medical or clinical findings that supported her assessment or any limitations, Dr. Smith stated: "Double vision caused by exotropia and hypertropia when examined last in 2017, patient could not tolerate prism in glasses to decrease double vision."  (*Id*.)  When asked if the limitations lasted for twelve consecutive months, Dr. Smith checked yes, adding: "Assuming his symptoms have not changed since 2017."  (*Id*.)

**<u>Michelle Kunkle, OTR/L, CHT</u>**

Occupational therapist Ms. Kunkle completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) on July 6, 2020.  (Tr. 293-98.)  Ms. Kunkle opined Mr. Inks could occasionally lift and carry up to thirty pounds.  (Tr. 293.)  She opined that Mr. Inks could at one time without interruption: sit for thirty minutes, stand for four minutes, and walk for six minutes; and could in total during an eight-hour workday: sit for six hours, stand for one hour, and walk for one hour.  (Tr. 294.)  Ms. Kunkle indicated that Mr. Inks needed a cane to ambulate, he could walk zero feet without use of cane, and he could use his free hand to carry small objects.  (*Id*.)  Ms. Kunkle opined he could frequently reach and feel and occasionally handle, finger, push, and pull bilaterally.  (Tr. 295.)  Ms. Kunkle opined Mr. Inks could never

11

use foot controls, noting he had constant tingling in his feet and would be at risk for a work injury.  (*Id.*)  She opined Mr. Inks could never climb ladders or scaffolds, crouch, or crawl and, he could occasionally balance, stoop, kneel, and climb stairs and ramps.  (Tr. 296.)  Ms. Kunkle opined that Mr. Inks could have no exposure to unprotected heights or moving mechanical parts, and operating a motor vehicle.  (Tr. 297.)  She opined that Mr. Inks could not shop, travel without a companion, walk a block at a reasonable pace on rough or uneven surfaces, climb a few steps at a reasonable pace with use of a single handrail, prepare a simple meal and feed himself, and sort, handle, or use paper/files.  (Tr. 298.)

With respect to his visual impairments, Ms. Kunkle opined that Plaintiff could not read very small print, determine differences in small objects, or avoid ordinary hazards in the workplace. (Tr. 296.)  She opined that he could read ordinary newspaper or book print and view a computer screen for short periods of time, referring to "optometrist report."  (*Id.*)  When asked to identify medical or clinical findings that supported her assessment or any limitations, Ms. Kunkle stated: "See optometrist report. [Patient] moves entire head to scan environment for safety due to lack of [Patient] visual scan ability."  (*Id.*)   She stated more generally that Mr. Inks's "vision increases safety risk."  (Tr. 298.)

**Rebecca Lauffenburger, D.O.**

Dr. Lauffenburger stated in a letter dated September 1, 2020:

Jamie Inks presented to my office today for a trial fitting with rigid gas permeable lenses to see if they could mask his corneal irregularity [] and reduce his diplopia [].  Unfortunately, the fitting was unsuccessful and did not alleviate his symptoms.

At this time, Jamie does suffer from monocular diplopia in all fields of gaze which limits his mobility and other Activities of Daily Living.

(Tr. 1046.)

### ii.      Consultative Psychological Examiner

Mr. Inks presented to Charles Misja, Ph.D., on November 6, 2020, for a psychological consultative examination.  (Tr. 876-83.)  Mr. Inks reported that he filed his disability claim because his vision problems did not allow him to read computers well, he had difficulty walking, and he had anxiety and bipolar disorder.  (Tr. 876.)  He reported being hospitalized in the past for seven suicide attempts, with his most recent hospitalization in 1999.  (Tr. 877.)  He also reported receiving mental health treatment on an outpatient basis, most recently in early 2020.  (Tr. 877-78.)  However, he had stopped treatment because of the pandemic.  (Tr. 878.)  He said he had experienced anxiety most of his life and did not leave his house at that time "because people are out there."  (*Id*.)  He noted that he had worked in sales, but generally interacted through email with people and tried to minimize "actual" contact with people in the work environment.  (*Id*.)  He said he would "sometimes chase client[s] physically and yell[] at them," but recognized that was not good for business.  (*Id*.)

When further discussing his work history, Mr. Inks said he did well at his jobs and "was an amazing employee," but also said that he got angry at customers when he worked at the sign shop and would not make signs for people he did not like.  (*Id*.)  Dr. Misja observed that Mr. Inks apparently did not "see any contradiction" in those two statements.  (*Id*.)  Mr. Inks said that his wife had to intervene at times when he got angry at customers.  (*Id*.)

Mr. Inks reported that he had friends but did not socialize often, saying that he did not like public or open spaces because he had panic attacks.  (Tr. 879.)  He said he listened to music and enjoyed cooking.  (*Id*.)  He also reported doing some cleaning, laundry, and small house repairs.  (*Id*.)  He did not do lawn work.  (*Id*.)  On a typical day, he said that he woke up at 7:00 a.m., made coffee, packed his wife's lunch, prepared his wife and sons to go to school/work,

13

rested for an hour, and then started on preparing lunch and dinner.  (*Id*.)  During the day, he rested and sometimes performed chores.  (*Id*.)

On mental status examination, Mr. Inks was dressed appropriately and was cordial and cooperative.  (Tr. 879.)  He had his eyes closed during the examination, saying that it hurt to have his eyes open, and that vision problems added to his headaches.  (*Id*.)  His affect was constricted, and his mood was depressed but stable.  (*Id*.)  Mr. Inks rated his depression as seven of ten and reported suicidal ideation but denied plan or intent.  (*Id*.)  He rated his anxiety as eight of ten, indicating that some of his anxiety was situational, like when he had visitors.  (*Id*.)  He estimated that he had panic attacks about once per month, which was less frequent than in the past; but he also said he left the house less frequently than he did in the past.  (*Id*.)  Mr. Inks also reported problems sleeping and said that his energy was low, but that he was starting to exercise. (*Id*.)  Dr. Misja observed no signs of hallucinations, delusions, grandiosity, paranoia, or thought disturbance.  (*Id*.)  Dr. Misja estimated that Mr. Inks's intelligence was average, but found that his insight was poor to fair and his judgment was limited.  (*Id*.)

Dr. Misja diagnosed: bipolar disorder, most recent episode depressed; social anxiety disorder; and agoraphobia.  (Tr. 880.)  Dr. Misja noted that he reviewed a letter from Mr. Inks's wife, explaining: "The content from the letter was consistent with the claimant's report and she added that his mood swings and unpredictable behavior have adversely affected not only their businesses but their family life as well and it was apparent the degree of impairment is between moderate and severe."  (Tr. 881.)

Dr. Misja opined that Mr. Inks's "historical problems in his work [were] likely to be repeated."  (Tr. 881.)  Dr. Misja further opined that Mr. Inks could understand, remember, and implement ordinary instructions.  (*Id*.)  He opined that Mr. Inks would likely have minimal

14

problems in the area of maintaining attention, concentration, persistence and pace, but would likely have severe limitations interacting with others and handling work stress. (Tr. 881-82.)

### iii. State Agency Psychological Consultant Opinions

State agency psychological consultant Kristen Haskins, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 98) and Mental RFC Assessment (Tr. 102-04) on November 17, 2020.  She opined that Mr. Inks had: no limitations in his ability to understand, remember, or apply information; mild limitations in his ability to concentrate, persist, or maintain pace; moderate limitations in his ability to adapt or manage oneself; and marked limitations in his ability to interact with others.  (Tr. 98.)  Dr. Haskins further opined that Mr. Inks:

- could work on a brief, superficial level with coworkers and supervisors, but was not at all suited to work with the public and should avoid conflict resolution;

- could work in a setting with well defined work goals;

- could carry out simple, routine work despite minor changes in the work setting; and

- would need major changes explained beforehand and gradually implemented to allow him time to adjust to the new expectations.

(Tr. 102-04.)

State agency psychological consultant Bonnie Katz, Ph.D., completed at PRT (Tr. 122) and mental RFC assessment (Tr. 127-28) on reconsideration on February 20, 2021.  Dr. Katz, like Dr. Haskins, opined that Mr. Inks had: no limitations in his ability to understand, remember, or apply information; mild limitations in his ability to concentrate, persist, or maintain pace; moderate limitations in his ability to adapt or manage oneself; and marked limitations in his ability to interact with others.  (Tr. 122.)  She agreed with the social interaction and adaptation limitations that Dr. Haskins included in her mental RFC assessment but added concentration and persistence limitations, opining that Mr. Inks's symptoms would interfere with this ability to

sustain close consistent attention to detail needed for work that was more complex, and would require a calm and consistent setting with clear performance expectations and no fast-paced production demands.  (Tr. 127.)

### iv.    State Agency Medical Consultant Opinions

State agency medical consultant Gail Mutchler, M.D., completed a physical RFC assessment on August 10, 2020. (Tr. 100-02.)  Dr. Mutchler adopted the prior ALJ's physical RFC findings dated June 1, 2020, which provided that Mr. Inks had the residual functional capacity to perform medium exertional work with the following additional limitations: no detailed reading, computer use, fine print, schematics, diagrams, blue prints, bright lighting, or telework; no climbing of ladders, ropes or scaffolds; and a clean environment with no high concentration of pollutants such as gases, odors, unprotected heights, moving machinery or commercial driving.  (*Id*.)  State agency medical consultant Abraham Mikalov, M.D., affirmed Dr. Mutchler's findings upon reconsideration on March 5, 2021.  (Tr. 124-27.)

### C.    Function Report and Hearing Testimony

### 1.    Plaintiff's Function Report

Mr. Inks completed a SSA Function Report on August 4, 2020 (Tr. 284-91), indicating that his wife recorded his responses "because of [his] vision issues" (Tr. 291).  He reported that his vision problems made it difficult for him to focus on a screen for more than a few minutes and see fine details.  (Tr. 284.)  He reported that trying to focus on screens or details caused headaches and eye fatigue.  (*Id*.)  He said he did not drive because his eyes fatigued quickly and he always saw "four of everything."  (Tr. 287, 288.)  He reported that he often could not see well enough to shave.  (Tr. 285.)  He said he could only prepare very simple meals with multiple breaks, after previously being able to prepare large meals for extended family and friends.  (Tr.

286.)  He said he had burned himself on the stove due to vision issues, and that his occupational

therapist warned him against cooking and using sharp objects.  (Tr. 291.)  He reported that his

wife took care of the finances because he could not see a check register or details on websites.

(Tr. 287.)  He reported that he used to enjoy biking, hiking, reading music, and playing an

instrument, but that his vision and balance issues prevented him for engaging in those activities.

(Tr. 288.)  He said he had not attended church recently because of the pandemic, but had to keep

his eyes closed due to vision issues when he did attend.  (*Id*.)

Mr. Inks reported that his anxiety and mood issues caused stubbornness, rigidity, and

grouchiness, and that he had problems getting along with other people.  (Tr. 288.)  When asked

how he got along with authority figures, Mr. Inks stated he could be "argumentative [and]

passive-aggressive, but [he] [had] great respect for rules, and [tried] to obey them."  (Tr. 289.)

He said he was never terminated from a job due to an inability to get along with others.  (*Id*.)  He

reported that he handled stress and changes in routine "terribly."  (Tr. 290.)

## 2.    Plaintiff's Hearing Testimony

Mr. Inks testified in response to questioning by the ALJ and his counsel at the telephonic

hearing on July 21, 2021.  (Tr. 37-48.)   Mr. Inks said that the main issues that prevented him

working full time were his quadruple vision, limited ability to walk, and vein problems.  (Tr. 41.)

Mr. Inks said that he saw double out of each eye.  (Tr. 47.)  He explained further that

images he saw were often a different size in each eye, which made focusing impossible.  (*Id*.)

He said his vision problems made driving an issue.  (*Id*.)  He had a driver's license but said he

did not drive because he did not feel it was safe to do so because of his vision problems.  (Tr. 44-

45.)  He said that he could not judge distances very well and the strain from using his eyes made

it difficult for him to keep his eyes open.  (Tr. 44-45, 47-48.)  He said he had not driven for at

least a year.  (Tr. 45.)  He reported his vision problems also made handling knives dangerous and picking up small items difficult.  (Tr. 45, 47.)  He said he picked up objects "like a toddler" and "just mash[ed] [his] hand towards the objects because" he did not "have the ability to focus well enough to pick things up."  (*Id.*)  He reported his vision impairments affected his ability to see things in the distance.  (Tr. 48.)  For example, if he were driving he could not read street signs unless he was right up on them.  (*Id.*)  But if he was walking on a street he could see the curb.  (*Id.*)  He reported that it would be difficult for him to navigate at home if the furniture was moved around.  (*Id.*)  He also reported difficulty judging openings for doorways and doors, stating he recently bruised his shoulder from misjudging and hitting a doorway.  (*Id.*)

Mr. Inks testified that he had been seeing a counselor for his mental health symptoms since about the beginning of 2021; he also reported that he was scheduled to see a psychologist, but did not know the date of the appointment.  (Tr. 42.)  He said he saw his counselor approximately every three to four weeks.  (*Id.*)  His mental health treatment was not as helpful as he had hoped it would be.  (*Id.*)  He also said that he was looking for a different counselor that would be covered by his insurance.  (*Id.*)  He reported having memory and concentration problems and said he needed to keep notes and lists to stay focused and accomplish tasks.  (Tr. 42-43, 45.)  He also reported having problems getting along with and relating to people.  (Tr. 43.)  He said the manner in which he spoke to people was a problem.  (*Id.*)  He testified that he had difficulty dealing with stressful situations, stating that his first response was typically to shut down and avoid the situation.  (Tr. 45-46.)  When avoiding a stressful situation was not an option, he said he usually lashed out or attacked those that were near him or trying to help him. (Tr. 46.)  He reported having trouble breathing during his hearing testimony, indicating he was trying to keep himself from "having a full-blown panic attack."  (*Id.*)

18

On a typical day, Mr. Inks testified that he woke up at 6:00 a.m., made coffee for his wife and himself, cleaned up the kitchen after his wife left for work at 6:30 a.m., rested until she returned from work at 8:30 a.m., had breakfast, made smoothies, cleaned the blender, destressed or rested for a couple of hours until around lunch time, made lunch, napped for two or three hours, made dinner, listened to music while lying in bed from about 7:30 p.m. until 10:30 p.m. (Tr. 43.)  He reported having few hobbies, explaining that most of his hobbies were outdoor activities that he had to give up; his remaining hobbies included listening to music and making things out of paper mache.  (*Id*.)  He could prepare meals, but said that preparing even basic meals took him several hours because he had to take many breaks.  (Tr. 45.)

### 3.      Vocational Expert's Hearing Testimony

A Vocational Expert ("VE") also testified at the hearing.  (Tr. 48-55.)  The VE testified that Mr. Inks's past relevant work as a small business owner was a light, skilled position and his work as router operator was a medium, skilled position.  (Tr. 49-50.)  For his first hypothetical, the ALJ asked the VE to assume an individual of Mr. Inks's age, education, and work experience limited to light work with the following additional limitations: can never climb ladders, ropes, or scaffolding; cannot perform detailed reading, computer use, fine print, schematics, diagrams, blueprints, bright lighting, or telework; cannot work at unprotected heights or around moving mechanical parts; cannot operate a motor vehicle; and can perform simple, routine tasks.  (Tr. 50.)  The VE testified that the described individual could not perform Mr. Inks's past work, but could perform other work, including sorter, packer, and cleaner housekeeper.  (Tr. 50-51.)

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical, except at a sedentary exertional level.  (Tr. 51.)  With that modification, the VE testified that the described individual could not perform Mr. Inks's past work, but could perform other work,

including assembler, inspector, and hand trimmer.  (Tr. 51-52.)  The VE testified that if the individual in the second hypothetical was limited to occasional close acuity there would be no sedentary level work available.  (Tr. 53.)

For his third hypothetical, the ALJ asked the VE whether an individual who was off task more than 15% of time in addition to normal breaks or who was absent from work two or more days per month would be able to perform any work.  (Tr. 52.)  The VE testified that those limitations would preclude work at all levels.  (*Id*.)  The VE explained that an individual could be absent one day per month on a routine basis and could be off task slightly below 15% of the time and remain competitive in the workforce.  (*Id*.)

The VE testified that unskilled workers have control over what they do in their work environment, but they cannot control what coworkers or supervisors do or what emotions they exhibit in the work environment.  (Tr. 53-54.)  The VE also testified that there would be no work available for an individual with limitations that prevented him from being able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or vehicles.  (Tr. 54-55.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

20

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[5] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

---

[5] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

## IV.    The ALJ's Decision

The ALJ made the following findings in his August 20, 2021, decision:[6]

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.  (Tr. 19.)

2.    The claimant has not engaged in substantial gainful activity since June 2, 2020, the alleged onset date.  (*Id.*)

3.    The claimant has the following severe impairments: visual dysfunction, anxiety, arthritis, depression, and substance addiction disorder.  (*Id.*)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19-21.)

5.    The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can never climb ladders, ropes, or scaffolds.  He is limited to jobs that require no detailed reading, computer use, fine print, schematics, diagrams, blueprints, bright lighting, or telework.  The claimant can never work at unprotected heights, never work around moving mechanical parts, and never operate a motor vehicle. The claimant is able to perform simple, routine tasks.  (Tr. 21-25.)

6.    The claimant is unable to perform any past relevant work.  (Tr. 26.)

7.    The claimant was born in 1973 and was 47 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date.  (*Id.*)

8.    The claimant has at least a high school education.  (*Id.*)

9.    Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including assembler, inspector, and hand trimmer.  (Tr. 26-27.)

Based on the foregoing, the ALJ determined that Mr. Inks had not been under a disability, as defined in the Social Security Act, from June 2, 2020, through the date the decision.  (Tr. 27.)

---

[6] The ALJ's findings are summarized.

## V.      Plaintiff's Arguments

Mr. Inks argues that the ALJ's findings regarding his mental health and the mental RFC lack the support of substantial evidence.  (ECF Doc. 11, pp. 1, 16-20; ECF Doc. 16, pp. 1-8.)  He also argues the ALJ erred in assessing his RFC because he failed to fully account for limitations caused by his visual impairments.  (ECF Doc. 11, pp. 1, 21-24; ECF Doc. 16, pp. 8-10.)

## VI.      Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the

courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached

by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit

has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not

be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio

2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether Substantial Evidence Supports Mental RFC**

In his first assignment of error, Mr. Inks argues that the ALJ erred in evaluating his

mental impairments and the resulting limitations.  (ECF Doc. 11, pp. 16-20; ECF Doc. 16, pp. 1-

8.)  Primarily, he challenges the ALJ's analysis of the three psychological opinions—those of

consultative examiner Dr. Misja and state agency psychological consultants Drs. Haskins and

Katz—arguing that the ALJ's persuasiveness analysis is insufficient and not borne out by the

record, and that the ALJ improperly based the RFC on his own interpretation of the evidence.

(ECF Doc. 11, pp. 16-20; ECF Doc. 16, pp. 1-8.)  In so arguing, Mr. Inks emphasizes that no

medical opinions support the RFC, while all of the psychological opinions found "substantially

greater limitations than did the ALJ."  (ECF Doc. 16, p. 3.)  Mr. Inks also argues that the only

mental limitation in the RFC—a limitation to simple, routine tasks—is inconsistent with the

ALJ's finding of a "severe" mental impairment.  (ECF Doc. 11, p. 19; ECF Doc. 16, pp. 6-8.)

The Commissioner argues in response that the ALJ "considered the medical and non-

medical evidence and reasonably determined that Plaintiff could perform simple, routine tasks"

and the mental RFC has the support of substantial evidence.  (ECF Doc. 14, pp. 10-17.)

### 1.      Whether ALJ Erred in Adopting an RFC Without a Supporting Opinion

Mr. Inks argues first that the ALJ improperly relied on his own interpretation of the

medical evidence, substituting his judgment for that of the medical experts, when he adopted a

mental RFC that was not supported by a medical opinion; in so arguing, he emphasizes that all

the psychological opinions included "substantially greater limitations" than the RFC.  (ECF Doc.

11, pp. 17-18; ECF Doc. 16, pp. 2-5.)  The Court finds this argument to be without merit.

An ALJ must determine a claimant's RFC based on all the relevant evidence in the

record.  *See* 20 C.F.R. §§ 404.1545(a)(1); 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 F.

App'x 149, 157 (6th Cir. 2009).  That includes medical opinion evidence.  But an ALJ is "not

required to recite the medical opinion of a physician verbatim in his residual functional capacity

finding."  *Poe*, 342 F. App'x at 157.  Indeed, the Sixth Circuit has "rejected the argument that a

residual functional capacity determination cannot be supported by substantial evidence unless a

physician offers an opinion consistent with that of the ALJ."  *See Mokbel-Aljahmi v. Comm'r of

Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) (finding an ALJ did not have a duty to obtain an

additional medical opinion despite giving "no weight" to the relevant medical opinions) (citing

*Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x 435, 442–43 (6th Cir. 2017); *Rudd v. Comm'r of

Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)).  As the Sixth Circuit has explained, requiring

an ALJ to base his RFC on a medical opinion would effectively confer on medical providers "the

authority to make the determination or decision about whether an individual is under a disability," which "would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled."  *Rudd*, 531 F. App'x at 728 (internal quotation and citation omitted).  Further, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."  *Poe*, 342 F. App'x at 157.

Here, the ALJ considered Mr. Inks's subjective complaints (Tr. 21-22, 25), summarized his treatment records (Tr. 22-23), and evaluated the persuasiveness of the opinion evidence (Tr. 23-25) in support of his mental RFC finding.  He was not obligated to base the RFC on a medical opinion, and he did not automatically assume the role of a medical expert when he adopted an RFC that was less restrictive than the opinions of record.  Instead, in a situation like this one— where the ALJ adopted an RFC that is less restrictive than the opinion evidence—the question before the Court is whether the ALJ appropriately assessed the evidence in support of his RFC. The Court will therefore turn to Mr. Inks's specific challenges to the ALJ's opinion analysis.

**2.      Framework for Evaluating the Medical Opinion Evidence**

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  An ALJ must explain how he considered consistency and supportability but need not explain how he considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

26

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

### 3. Whether ALJ Erred in Assessing Persuasiveness of State Agency Psychological Consultant Opinions

In assessing the persuasiveness of the state agency psychological consultants' opinions, the ALJ explained his findings as follows:

> State Agency psychological consultants asserted that the claimant had marked limitations interacting with others and moderate limitations in adapting or managing oneself with no more than mild restriction in the other domains []. The consultants said that the claimant required a calm consistent setting with clear performance expectations and no fast-paced production demands []. The consultants noted that the claimant could work on brief superficial levels with co-workers and supervisors, but no contact with the public and no conflict resolution []. According to the consultants, the claimant could carry out simple routine tasks with minor changes in the work setting and major changes being explained before and gradually implemented []. <u>The undersigned finds such conclusions unpersuasive</u>. While the claimant had ongoing mood and anxiety symptoms, the record did not establish the substantial social limitations or the need for a static environment as the consultants described. <u>The claimant had only intermittent mental health therapy and his condition stabilized to a large degree with treatment, such that he had only mild anxiety and depression with generally intact cognition</u>

<u>and appropriate behavior</u>. Such facts were inconsistent with the limitations that the consultants described.

(Tr. 25 (emphasis added) (internal citations omitted).)  Mr. Inks argues that this persuasiveness analysis is "not borne out in the record" in two ways: (1) his mental health treatment was not appropriately characterized as "intermittent"; and (2) the record did not support a finding that his mental impairments "stabilized to a large degree with treatment."  (ECF Doc. 11, pp. 18-19.)

In support of the first contention—that his treatment was not "intermittent"—Mr. Inks notes that he attended counseling twice a month from December 2020 through May 2021, was seen monthly for medication management during that time, and started treatment with a new medication management provider in July 2021.  (*Id.* at p. 18.)  This is consistent with the ALJ's own evidentiary summary.  (Tr. 22-23.)  The evidence also shows, however, that Mr. Inks did not receive treatment for his mental impairments between the June 2020 alleged onset date and December 2020.  Indeed, Mr. Inks reported to the consultative examiner in November 2020 that his most recent mental health treatment was in early 2020, when he stopped due to the pandemic. (Tr. 877-78.)  Mr. Inks also stopped treatment with his mental health providers at the Counseling Center in May of 2021, after only six months, before initiating treatment with a new provider in July 2021.  The record thus contains substantial evidence to support the ALJ's characterization of Mr. Inks's mental health treatment as "intermittent."

In support of his second contention—that his anxiety and depression did not "stabilize to a large degree with treatment"—Mr. Inks acknowledges that he had "intermittent improvement in his symptoms" but highlights certain elements of his July 2021 psychiatric assessment as inconsistent with the ALJ's characterization.  (ECF Doc. 11, pp. 18-19.)  Specifically, he highlights a self-reported depression screening indicative of "severe depression," a new diagnosis of bipolar II disorder, and a new prescription for Seroquel.  (*Id.*)

28

The Court finds that record contains substantial evidence to support the ALJ's finding that Mr. Inks's mental health "condition stabilized to a large degree with treatment, such that he had only mild anxiety and depression with generally intact cognition and appropriate behavior." (Tr. 25.)  Mr. Inks reported at a February 16, 2021 appointment that he had started his new medication and "felt good."  (Tr. 1003.)  On examination, he was oriented with coherent speech and fair judgment, insight, and memory.  (Tr. 1005.)  He was anxious and depressed, and expressed feelings of worthlessness, hopelessness, and guilt, but his mood was euthymic, and his thought content/process was appropriate.  (Tr. 1005-06.)  His Pristiq was increased to 50 mg. (Tr. 1006.)  When he returned on March 16, 2021, he reported he was doing "ok," his "mood [had] 'leveled off pretty well,'" he was less depressed with less anxiety, and he had been able to "keep his stress levels down."  (Tr. 1012.)  At a May 13, 2021 appointment, Mr. Inks again reported doing well.  (Tr. 1037.)  On examination, he was oriented with coherent speech and fair judgment, insight, and memory.  (Tr. 1039-40.)  His mood was euthymic, and his thought content/process was appropriate.  (Tr. 1040.)  When Mr. Inks saw LPCC Park on May 26, 2021, he reported that he had gone to the grocery store on his own.  (Tr. 1043.)  LPCC Park observed Mr. Inks's anxiety and depression were mild, his appearance, hygiene, and participation level were good, he was not agitated, and he had no problems with judgment.  (Tr. 1042.)

Notwithstanding the reported and observed stabilization of his mental health symptoms, Mr. Inks argues the ALJ's finding that his condition had stabilized was not borne out by the record because of a July 2, 2021 psychiatric assessment, where a screening indicated severe depression, he was diagnosed with bipolar II disorder, and he was started on Seroquel.  (ECF Doc. 11, pp. 18-19 (citing Tr. 1121-22.)  The ALJ did not disregard evidence of this assessment. (Tr. 23.)  More importantly, Mr. Inks does not explain how a depression screening, diagnosis, or

prescription from an appointment establishing care with new provider deprived the ALJ of substantial evidence to support his finding that Mr. Inks's anxiety and depression "stabilized to a large degree with treatment."  (Tr. 25.)  Certainly, the diagnosis and medication alone are not sufficient to undermine the ALJ's finding.  *See, e.g., Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition."); *Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 436 (6th Cir. 2010) (finding use of certain medications "is not necessarily indicative of a severe mental impairment").

An independent review of the record does not substantiate Mr. Inks's argument.  While Mr. Inks subjectively reported increased symptoms at the July 2021 initial assessment (Tr. 1117, 1120), his objective mental status findings were largely normal (Tr. 1121).  Despite being anxious and reporting some paranoid, grandiose, or nihilistic delusions, Mr. Inks behaved appropriately, his speech was appropriate, his "social relatedness" was euthymic, he had a full and appropriate affect, his associations were intact and linear, his insight and judgment were appropriate.  (Tr. 1121.)  He reported thoughts of death, but not of suicide.  (*Id.*)  The July 2021 psychiatric assessment did not deprive the ALJ of substantial evidence to support his broader finding that Mr. Inks's mental impairments had largely stabilized with treatment.

In considering the ALJ's analysis of the state agency medical consultant's opinions, it also does not escape notice that most of Mr. Inks's mental health treatment records post-date these opinions.  There were no mental health treatment records in evidence when Dr. Haskins issued her November 2020 opinion, and her opinion was based exclusively on the psychological consultative examination.  (Tr. 102-04.)  When Dr. Katz issued her February 2021 opinion, the only mental health treatment records in evidence were the Counseling Center records for December 2020 and January 2021.  (Tr. 121, 127-28, 884-907.)  Given the ALJ's obligation to

consider the evidence post-dating the state agency opinions, *see Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007), the record does not support Mr. Inks's contention that the ALJ improperly substituted his own judgment for that of the state agency consultants when he adopted a more limited RFC based on his consideration of the more recent mental health treatment records.

For all the reasons set forth above, the Court finds Mr. Inks has not met his burden to show that the ALJ inadequately articulated, or lacked substantial evidence to support, his finding that the opinions of the state agency psychiatric consultants were not persuasive, or his consequent adoption of a more limited mental RFC.

### 4. Whether ALJ Erred in Assessing Persuasiveness of Psychological Consultative Examiner's Opinion

In assessing the persuasiveness of consultative psychological examiner's opinion, the ALJ explained his findings as follows:

> The claimant had a psychological consultative exam with Charles Misja, Ph.D., where the claimant reported anxiety and bipolar disorder []. He described a history of suicidal thoughts and he said he was not leaving his house []. He reported that he was socially isolated and he had trouble managing workplace stress []. The claimant displayed depressed mood and constricted affect with suicidal ideation but no plan or intent []. He had unremarkable speech, cooperative behavior, appropriate dress, and generally normal cognition []. He had poor to fair insight with limited judgment [].
>
> Dr. Misja opined that the claimant could understand, remember, and implement ordinary instructions, he had minimal problems with attention, and he had severe limitations interacting with others and handling work stress []. The undersigned finds Dr. Misja's opinion unpersuasive. While he examined the claimant, the record did not support the conclusions that the claimant had severe limitations in social functioning and handling workplace pressure. Indeed, Dr. Misja's conclusions appeared to be based largely on the claimant's self reports of difficulty handling workplace pressure and interacting with others in the workplace. The treatment notes failed to confirm such substantial restrictions.

(Tr. 23-24 (emphasis added) (internal citations omitted).)  Mr. Inks argues that this persuasiveness analysis is inadequate because the ALJ did not explain how he reached the

conclusion that Dr. Misja's opinion "appeared to be based largely on [Mr. Inks's] self-reports," or how he reached the conclusion that Mr. Inks's self-reported work history was unreliable. (ECF Doc. 11, p. 19 (citing Tr. 24).)

The Court finds that the ALJ's persuasiveness analysis was sufficiently explained.  A review of Dr. Misja's report makes it clear that his opinions regarding likely "severe" problems in Mr. Inks's ability to interact with others and respond to work pressures were largely based on Mr. Inks's self-reports.  (Tr. 881-82.)  With respect to Mr. Inks's ability to respond appropriately to supervision and coworkers in a work setting, Dr. Misja made the following findings:

> The <u>claimant reported</u> no legal history and does not appear to have a personality disorder. However, he has demonstrated extremely poor judgment at work including not only yelling at customers but chasing them as well, <u>he reported</u>. His wife had to intervene because he wouldn't sell signs to customers he didn't like. Despite being fired several times these behaviors have persisted. Problems in this area are likely to be in the severe range.

(Tr. 881 (emphasis added).)  In contrast, Dr. Misja's objective clinical observations included findings that Mr. Inks was "cordial and cooperative," displayed a developed flow of conversation, and had adequate grooming and unremarkable speech.  (Tr. 879.)  With respect to Mr. Inks's ability to respond appropriately to work pressures, Dr. Misja found:

> The longest he's had a single job is ten years and he stated that he had to quit that job because he couldn't handle the demands of his job. <u>He stated</u> that on one hand he was "an amazing employee" <u>but also stated</u> that he's been fired from many jobs for a variety of reasons.  Problems in this area are likely to be in the severe range.

(Tr. 881-82 (emphasis added).)  In contrast, Dr. Misja observed that Mr. Inks was fully oriented, recalled 2/3 words after a delay, performed serial 7s, and was functioning in the average range of intellectual ability, although he did opine that Mr. Inks had poor to fair insight and limited judgment.  (Tr. 880.)

Given Dr. Misja's explicit reliance on Mr. Inks's self-reported difficulties in the work setting as explanation for his opinion finding, and the contrast between Dr. Misja's findings and his clinical observations, the Court concludes that the ALJ adequately explained his finding that Dr. Misja's findings of severe limitations "appeared to be based largely on the claimant's self reports of difficulty handling workplace pressure and interacting with others in the workplace." (Tr. 24.)  The Court also finds it was not improper for the ALJ to find the opinion was less persuasive because it was based on Mr. Inks's self-reports.  *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016).

Further, the ALJ did not simply discount Mr. Inks's self-reported difficulties, but also found that "the record did not support" severe limitations in interaction and adaptation, and that "[t]he treatment notes failed to confirm such substantial restrictions."  (Tr. 24.)  While Mr. Inks was not participating in mental health treatment at the time of his consultative examination (Tr. 877-78), a review of his subsequent treatment records is consistent with the ALJ's observation that those records "failed to confirm" severe limitations in those two areas of mental functioning. (*See, e.g.*, Tr. 902-03, 1005, 1039-40.)

As to the reliability of Mr. Inks's self-reported difficulties in the workplace, the Court observes that Dr. Misja himself noted Mr. Inks's own contradictory reports that he did well at his jobs and was an amazing employee.  (Tr. 878.)  Mr. Inks also indicated in his August 2020 function report that he had great respect for the rules, tried to obey them, and was never terminated from a job due to an inability to get along with others.  (Tr. 289-90.)

Finally, as with the state agency psychological consultant opinions, the Court observes that Mr. Misja's psychological opinion predates all of the recent mental health treatment records the ALJ relied upon in adopting a less restrictive mental RFC.

For the reasons set forth above, the Court finds the ALJ sufficiently explained his reasons for finding Dr. Misja's opinion as to "severe" limitations was not persuasive, and ultimately made findings that were supported by substantial evidence.

### 5. Whether an RFC Limitation to Simple, Routine Tasks is Inconsistent with a Finding that Mental Impairments are "Severe" at Step Two

Mr. Inks argues finally that the only mental limitation in the RFC—to simple, routine tasks—is inconsistent with the finding of "severe" mental impairments.  (ECF Doc. 11, p. 19.) He does not flesh out the legal grounds for this argument until his reply brief, where he asserts that "a severe impairment presupposes a significant limitation on the ability to perform the basic demands of unskilled work."  (ECF Doc. 16, pp. 6-8 (citing 20 C.F.R. §§ 404.1522, 416.922).)

Social Security regulations provide the following definition as to "[w]hat we mean by an impairment(s) that is not severe":

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1522; *see also* 20 C.F.R. § 416.922.

Mr. Inks is effectively arguing that the above regulatory language establishes concretely that a mental impairment which significantly limits a person's ability to perform more complex tasks—e.g., skilled or semi-skilled work—must be assessed as "non-severe" at Step Two so long as the person remains able to perform simple, routine tasks—consistent with unskilled work.  But that is not at all what the regulation states.  The regulation states only that "[u]nderstanding, carrying out, and remembering simple instructions" is an example of the basic work activities contemplated in the regulations.  *Id.*  That language does not preclude a similar finding that, for example, "understanding, carrying out, and remembering complex instructions" is also a basic work activity as contemplated in the regulations.  The Court finds that there is nothing in the regulatory language which requires a finding that a limitation to simple, routine tasks "is inconsistent with the [ALJ]'s finding of a severe mental impairment."  (ECF Doc. 11, p. 19.)

Other than his own unique construction of the governing regulations, Mr. Inks cites no other authority for the proposition that a person whose mental impairments limit him to the performance of simple, routine tasks does not have a severe mental impairment.  Such a finding would go against the bulk of Social Security jurisprudence and practice.  Indeed, in this very case, the VE testified that a limitation to simple, routine tasks precluded Mr. Inks from performing any of his past relevant work, which was skilled.  (Tr. 49-52.)

For the reasons set forth above, the Court finds that Mr. Inks has failed to demonstrate that the mental RFC limiting Mr. Inks to the performance of simple, routine tasks was "inconsistent" with the finding that Mr. Inks's mental impairments were severe at Step Two.

The Court accordingly finds Mr. Inks's first assignment of error to be without merit.

35

**C.    Second Assignment of Error: Whether ALJ Erred by Failing to Include an Inability to Avoid Ordinary Hazards in the Physical RFC**

In his second assignment of error, Mr. Inks argues that the ALJ erred in assessing his physical RFC because he should have included a limitation to account for Mr. Inks's inability to avoid ordinary hazards, such as boxes, doors ajar, or approaching people or vehicles.  (ECF Doc. 11, pp. 21-24; ECF Doc. 16, pp. 8-10.) The Commissioner responds that the ALJ appropriately accounted for Mr. Inks's visual limitations when he limited him to sedentary work that did not require detailed reading, computer use, fine print, schematics, diagrams, blueprints, bright lighting, or telework and did not require work at unprotected heights, around moving mechanical parts, or operation of a motor vehicle. (ECF Doc. 14, pp. 17-25.)

More specifically, Mr. Inks argues that the ALJ erred in (1) finding the opinion of optometrist Dr. Smith "persuasive except for the limitation with respect to ordinary hazards" and (2) failing to consider subjective symptom reports that were consistent with a need to avoid ordinary hazards.  (ECF Doc. 11, pp. 21-24.)  Each argument is addressed in turn.

**1.    Whether ALJ Erred in Assessing Persuasiveness of Optometric Opinion**

In assessing the persuasiveness of the medical opinion of optometrist Dr. Smith,[7] the ALJ explained as follows:

> Jennifer Smith, O.D. stated that the claimant could not avoid ordinary hazards in the workplace or read very small print []. Dr. Smith reported that the claimant could not tolerate prism glasses for double vision but he could reading a newspaper, view a computer screen, and determine differences between small objects []. The undersigned finds Dr. Smith's opinion persuasive. She treated the claimant, giving her insight into the claimant's functioning and the exam findings confirmed Dr. Smith's conclusions generally. However, the record as a whole did not support the conclusion that the claimant could not avoid ordinary hazards. There was no indication that he struggled to avoid such hazards in his daily life.

---

[7] The Court notes that Dr. Smith rendered her opinion in May 2020, but had not evaluated him since 2017.  (Tr. 1044.)  Dr. Smith opined that Mr. Inks limitations had lasted for twelve consecutive months, noting she was providing that opinion "[a]ssuming his symptoms [had] not changed since 2017."  (*Id.*)

(Tr. 24 (emphasis added) (internal citations omitted).)  Mr. Inks challenges the ALJ's conclusion that "the record as whole did not support the conclusion that the claimant could not avoid ordinary hazards."  (ECF Doc. 11, pp. 21-24.)  Specifically, he asserts that the ALJ's analysis of persuasiveness is insufficient because he failed to (1) support his conclusions with citations to the record and (2) recognize that Dr. Smith's opinion was consistent with the medical opinions of Dr. Lauffenburger and Ms. Kunkle.   (ECF Doc. 11, pp. 21-22; ECF Doc. 16, pp. 8-9.)

As discussed above, an ALJ must explain how he considered "supportability" and "consistency" in evaluating the persuasiveness of a medical opinion.  *See* 20 C.F.R. § 404.1520c(b)(2).  "Supportability" is the extent to which a source's own objective findings and supporting explanations substantiate or support the findings in the opinion.  *See* 20 C.F.R. § 404.1520c(c)(1).  "Consistency" is the extent to which a source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.  *See* 20 C.F.R. § 404.1520c(c)(2).  Both of Mr. Inks's challenges address the issue of "consistency."

Mr. Inks does not cite any authority in support of his first contention—that the ALJ erred by failing to provide record citations to support of his findings that "the record as whole did not support the conclusion that the claimant could not avoid ordinary hazards" and "[t]here was no indication that he struggled to avoid such hazards in his daily life"—and also does not offer supporting arguments.  (Tr. 24.)

Generally, an ALJ is not required to identify or discuss all treatment records when addressing the persuasiveness of a medical opinion.  To articulate a decision supported by substantial evidence, an ALJ is not "required to discuss each piece of data in his opinion, so long as he consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r*

*of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006)).  An ALJ is also permitted to rely on previously articulated information to support his opinion analysis.  *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Here, the ALJ had discussed various activities that Mr. Inks was able to perform, including attending church, preparing his children for school, preparing simple meals, doing laundry, and loading the dishwasher.  (Tr. 20.)  The ALJ had also discussed Mr. Inks's treatment for his visual impairments, including a neurology examination for double vision with normal imagery and normal physical examination findings, where the provider noted the possibility of a conversion disorder, but Mr. Inks indicated he was not interested in associated treatment.  (Tr. 22-23.)  In this context, the Court finds the ALJ did not err by failing to cite to specific evidence to support his conclusion that "the record as whole did not support the conclusion that the claimant could not avoid ordinary hazards."  (Tr. 24.)

In support of his second contention—that the ALJ erred in failing to recognize that other medical opinions of record were consistent with Dr. Smith's limitation to avoid ordinary hazards—Mr. Inks points to Dr. Lauffenburger's September 2020 opinion that Mr. Inks's visual impairments limited his mobility and other activities or daily living (ECF Doc. 11, p. 21 (citing Tr. 1046)) and occupational therapist Ms. Kunkle's July 2020 opinion that Mr. Inks was unable to avoid ordinary hazards in the workplace and moved his "entire head to scan environment for safety due to lack of [] visual scan ability" (*id.* (citing Tr. 296)).

A review of the ALJ decision reveals that the ALJ did not ignore either of the opinions. (Tr. 24.)  Instead, he considered both opinions and explained his findings as follows:

> Michelle Kunkle, OTR/L said that the claimant could occasionally lift and carry up
> to thirty pounds [].  Mr. Kunkle noted that the claimant could sit for thirty minutes,

stand for four minutes, and walk for six minutes at a time []. According to Ms. Kunkle, the claimant could sit for six hours, stand for one hour, and walk for one hour total in a workday []. Ms. Kunkle said that the claimant required use of a cane, he could frequently reach and feel with occasionally handling, fingering, pushing, and pulling bilaterally []. Ms. Kunkle noted that the claimant could never use foot controls with further postural limitations []. Ms. Kunkle reported that the claimant could not read very small print, determine differences in small objects, or avoid hazards in the workplace []. Ms. Kunkle concluded that the claimant could have no exposure to unprotected heights or moving mechanical parts, with no operation of a motor vehicle.

The undersigned finds Ms. Kunkle's opinion unpersuasive. While she treated the claimant, the record failed to document the extreme degree of dysfunction that Ms. Kunkle described. Indeed, while the claimant had an ataxic gait and used a cane at times, other exams documented generally normal strength, sensation, and gait. He also improved notably with occupational therapy. Accordingly, the evidence did not establish the dysfunction that Ms. Kunkle described.

Rebecca Lauffenburger, OD said that the claimant had monocular diplopia in all fields of gaze, which limited his mobility and daily activities []. The undersigned Dr. Lauffenburger's statement unpersuasive. She did not specify the degree to which the claimant was limited or specific functional limitations. Thus, her opinion was of little assistance in determining the claimant's residual functional capacity.

(Tr. 24 (emphasis added) (internal citations omitted).)

Thus, the ALJ acknowledged Ms. Kunkle's opinion regarding hazards in the workplace and articulated his basis for finding her opinions unpersuasive. (*Id.*) As with Dr. Smith's opinion as to ordinary hazards, the ALJ found the record did not support the opined level of limitation. (*Id.*) The ALJ also acknowledged Dr. Lauffenburger's opinion that Mr. Inks's visual impairment limited his mobility and daily activities, but found the opinion unpersuasive and of little assistance in determining the RFC because it did not specify the degree or nature of any functional limitations. (*Id.*) The Court finds that Mr. Inks has failed to show that the ALJ erred in his consideration of these opinions. Likewise, it was not error for the ALJ to discuss his findings regarding each opinion only once, without specifically addressing the other opinions within his analysis of Dr. Smith's opinion. *See Crum*, 660 F. App'x at 457.

For the reasons set forth above, the Court finds the ALJ sufficiently explained his reasons for finding Dr. Smith's opinion as to Mr. Inks's ability to avoid "ordinary hazards" was not persuasive, and that the ALJ's findings were supported by substantial evidence.

### 2.      Whether ALJ Erred in Assessing Subjective Symptom Reports

Finally, Mr. Inks argues that he experienced and reported symptoms that were consistent with Dr. Smith's opinion that he lacked the ability to avoid ordinary hazards and that the ALJ erred in his evaluation of those subjective symptoms.  (ECF Doc. 11, pp. 22-24.)  He argues specifically that the ALJ did not adequately articulate his analysis of the subjective complaints and did not acknowledge parts of his functional reports and testimony that suggested an inability to avoid ordinary hazards.  (*Id*.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. § 404.1529(c)(3).

Of course, an ALJ may not cherry pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *See, e.g., Gentry v. Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014); *Minor v. Comm'r*, 513 F. App'x 417, 435 (6th Cir. 2013).  But "an ALJ does

not 'cherry pick' the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Solembrino v. Astrue*, No. 1:10–cv–1017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011).  Indeed, the Sixth Circuit has explained that allegations of cherry-picking evidence by the ALJ are "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (citing *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009)).

Here, a review of the decision reveals that the ALJ considered the entire record, based his findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467.  The ALJ acknowledged that Mr. Inks had a severe visual impairment (Tr. 19) and reported difficulty focusing on screens and driving due to his vision problems (Tr. 22), but concluded that his "statements concerning the intensity, persistence and limiting effects of [the] symptoms [caused by his severe impairments] [were] not entirely consistent with the medical evidence and other evidence in the record" (*Id.*). He considered that "[i]n June 2020, the claimant requested that his physician fill out disability paperwork, but the physician declined until the claimant tried RGP over-refraction and he also advised the claimant to attend occupational therapy for difficulty using a computer, fatigue, and depth perception []." (Tr. 22, (citing Tr. 378).)  The ALJ considered records from a neurology examination in October 2020 when Mr. Inks reported double vision in both eyes and the neurologist noted the possibility of conversion disorder, but Mr. Inks was not interested in psychotherapy.  (*Id*. (citing Tr. 859).)  He considered Mr. Inks's continued reports of double vision and use of an eye patch in late 2020 and 2021, noting a stable eye exam at a June 2021 vision examination.  (Tr. 23 (citing Tr. 1083).)  Following his consideration of the medical

records and opinion evidence, the ALJ explained in further detail his reasons for finding Mr.

Inks's alleged symptoms and limitations only partially consistent with the evidence, stating:

> With respect to the claimant's alleged symptoms and limitations, the undersigned finds such assertions only partially consistent with the evidence. The record showed that the claimant had ongoing complaints of pain and double vision. His vision symptoms remained during the relevant period with little apparent change over time and limited his ability to read small print, use a computer, or drive.

(Tr. 25.)  The Court finds that the ALJ sufficiently explained his reasons for finding Mr. Inks's

allegations of symptoms related to his visual impairment not as limiting as he alleged.  The ALJ

was not required to "accept [his] subjective complaints." *Jones*, 336 F.3d at 476.  While the ALJ

did not discuss every subjective complaint identified in Mr. Inks's brief (ECF Doc. 11, p. 22), he

was not required to do so.  *Boseley*, 397 F. App'x at 199.  The ALJ weighed the evidence and

credited Mr. Inks's allegations of visual limitations to the extent he found them supported by the

record.  While Mr. Inks argues that the evidence supports a finding that his visual impairment

was more limiting than the ALJ found it be, it is not this Court's role to "try the case *de novo*,

nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

For the reasons set forth above, the Court finds the ALJ complied with the regulations

when evaluating the subjective symptoms relating to his visual impairment.  The Court further

finds that the ALJ did not err by not adopting and incorporating into the RFC a limitation that

Mr. Inks was unable to avoid ordinary hazards in the workplace.

## VII.   Conclusion

For the foregoing reasons, the Court **AFFIRMS** the final decision of the Commissioner.

April 8, 2024

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

42